## PORTER, Price Administrator, v. HUBER et al.

### No. 735.

District Court, W. D. Washington, S. D. Oct. 21, 1946.

Attorneys' names stricken as counsel.

Anne O. Gibbons, of Seattle, Wash., for plaintiff.

R. C. Finley and George H. Layman, both of Seattle, Wash. and Harold Troy, of Olympia, Wash., for defendants.

LEAVY, District Judge.

The defendants in this case have as counsel attorneys Robert C. Finley, George H. Layman and Harold Troy.

During the course of an argument involving preliminary motions it was stated by attorney George H. Layman that he desired to withdraw from his representation of the defendants for the reason that it had been brought to his attention that while an attorney and employee of the plaintiff he had written a letter to the defendants concerning the matter in controversy. Upon interrogation by the Court it appeared that attorney Robert C. Finley, at the time the letter was written, was likewise an employee of the plaintiff in a legal capacity, and was the superior of Layman. Finley asserted that he had no knowledge of the letter in question and therefore felt that he

would not be disqualified from continuing his representation of the defendants. The Court, on its own motion, directed attorneys representing the respective parties to submit a stipulation as to the facts relating to the employment of attorneys Finley and Layman by the O.P.A., plaintiff in this action.

A written stipulation has been submitted.

From the stipulation the Court finds that beginning April, 1942 and continuing to May, 1944 Robert C. Finley was "District Enforcement Attorney, Seattle District Office" for the Office of Price Administration, and that from May, 1944, to June 15, 1945, he was advanced to the position of "Director, Food Enforcement Division, National Office, Washington, D. C."

George H. Layman, from February 10, 1943, to March, 1944, was "Enforcement Attorney, Seattle District Office" for the Office of Price Administration when on the later date he was made "Litigation Attorney" in the same office, in which position he continued until May, 1944 at which time he was promoted to the position of "District Enforcement Attorney, Seattle District Office."

From the above information it therefore appears that Finley was no longer with the O.P.A. agency after June 15, 1945, and Layman after April 1, 1945.

Letters were written in April and July, 1946, by Mr. Finley to his former associates in the plaintiff agency on behalf of the defendants in this action, and in April, 1946, there was a long distance telephone call from Mr. Finley to the Regional Administrator in San Francisco protesting certain garnishment proceedings in this case and requesting voluntary dismissal by the O.P.A. From this it must be assumed that Mr. Finley was actively retained by the defendants, at least in April, 1946.

The stipulation further disclosed that prior to accepting employment from the defendants, both Mr. Finley and Mr. Layman consulted with attorneys in the Seattle District Office of O.P.A. to ascertain if there was anything in the files indicating that it would be improper or undesirable for them to become counsel for the defendants. Nothing was found in the Seattle

files in reference to the pre-litigation aspects of this case. Both attorneys assert that they had no personal knowledge or recollection of any facts in connection with this suit.

After the issue was raised in this Court, a more complete check of the records and files of the O.P.A. office, both in Seattle and Washington, D. C., disclosed numerous matters dealing directly with steps to be taken in reference to enforcement of price regulations as to these defendants in which both Mr. Finley and Mr. Layman were involved. The stipulation disclosed that on December 24, 1943, a telegram, originating in the Regional Office, was addressed to Mr. Finley instructing him that the prices charged by the defendants were high and that immediate investigation should be begun. An answering telegram, signed by Mr. Layman, who was then acting as Enforcement Attorney, advised that an investigation had been made and that he had been informed that the defendants were using the wrong pricing method.

On January 5, 1944, a telegram from the Regional Office, addressed to Mr. Layman, directed him to stop the sales of apples by the defendants and to collect treble damages. This was followed by a telegram from a Mr. Patterson of the Regional Office directing that the defendants be advised that their pricing method was wrong, which was responded to by a telegram from Mr. Layman to the Regional Office advising that his office was requesting written assurance from the defendants that they would make no further sales.

Thereafter, a letter was written under date of January 5, 1944, bearing the typewritten signature of Robert C. Finley as District Enforcement Attorney, and signed by George H. Layman as Enforcement Attorney, informing the defendants that they must refrain from continuing the use of their pricing methods. This letter was not discovered or remembered by either of these attorneys until it was sent from the National Office to the Seattle Office in July, 1946.

Another letter, under date of January 12, 1944, from George H. Layman to the Regional Office, advised that no court action

appeared necessary as long as no further sales were being made.

On February 3, 1944, a memo to Mr. Layman from Muriel Mawer, designated as "Sr. Price Attorney," suggested that the price of peaches sold by Midfield be investigated.

Following this memo, under date of March 7, 1944, a letter bearing the typewritten signature of Mr. Finley, signed by Richard Rathbun, his subordinate, was sent to the defendants herein requesting information from the defendants concerning the pricing of their products. Again, on March 18, 1944, another letter similarly signed requested the same information from the defendants.

On May 31, 1944, a letter signed by George H. Layman, as District Enforcement Attorney, by E. V. Patterson, Commodity Investigator, was addressed to defendants requesting their selling prices of frozen peaches and apples.

On September 8, 1944, a teletype was directed to George H. Layman as District Enforcement Attorney, for the attention of Richard Rathbun "requesting recommendations and other pertinent information on the Midfield application for a price." This communication was responded to on the same date by a teletype bearing the signature of "George H. Layman by Richard Rathbun" advising that the Enforcement Division was unable to obtain a definite statement from the defendants.

A memo dated November 2, 1944, directed to George Layman as District Enforcement Attorney, from Robert C. Finley, who was then Director of the Food Enforcement Division, Washington, D. C., was signed by John Gorfinkel. This memo referred to complaints involving the defendants.

On November 2, 1944, Robert C. Finley, then Director of Food Enforcement Division, National Office, Washington, D. C., addressed a communication to the Delapenna Company in which acknowledgment was made of their complaint of violation by the Midfield Packers. This letter was responded to by one written over the typewritten signature of George H. Layman by C. E. Leman, an Investigator, and another letter

134

signed in the same manner was written to the same parties under date of December 13th advising them that their complaint had been referred to the National Office for approval or rejection.

On May 24, 1945, a teletype was addressed to "Robert C. Finley, attention of Richard Rathbun, OPA, Washington, D. C.," signed by Jane Sue Leflin, Regional Food Enforcement Attorney, giving a list of prices that were being charged by the defendants in the sale of their products.

On June 2, 1945, Mr. Finley, as Director of Food Enforcement Division, sent to the Seattle Office a telegram which stated that "the prices do not seem high, advise if suit has been filed". There was an answering teletype under date of July 2nd addressed to Mr. Finley, signed by Charles B. Dobrin, Chief of the Food Enforcement Division of Seattle, reporting that the Seattle Price Division felt that some prices applied for were high and requesting that prices be issued as soon as possible.

The foregoing is a summary of the facts stipulated.

It will be noted that this action was commenced on May 28, 1945, and was pending at the time the last two mentioned telegrams were exchanged. The complaint alleged certain violations on the part of the defendants of the Price Control Act and Regulations, over a period of time commencing May 28, 1944 and continuing down to the date of filing of said complaint. It further alleged that the products sold and delivered as frozen foods by the defendants involved the 1943 and 1944 packs, and that said sales were in excess of the maximum price.

This action seeks injunctive relief as against the defendants, and a money judgment for three times the amount by which the price or consideration received by the defendants exceeded maximum prices established by Maximum Price Regulation 409.

The first appearance on behalf of the defendants, as shown by the record, is an answer filed herein under date of April 18, 1946, which answer is subscribed by Robert C. Finley as one of the attorneys for the defendants. The first appearance of George H. Layman as attorney of record, as shown by the files in this case, is under date of July 11, 1946.

The issue for determination is whether either one or both of these attorneys are disqualified from appearing further in this case as counsel for the defendants.

While the Court, in disposing of this matter, accepts the stipulation that neither of these attorneys had any independent knowledge or recollection of the facts involved in this litigation nor the complaints being considered against the defendants in this case, still, it is not clear to the Court how it should happen that their memories were not refreshed concerning a matter that had so long been pending in their agency involving sales of merchandise of substantial magnitude covering so long a period of time. The disclosures made by the stipulation indicate that a higher degree of caution should have been exercised by both of these attorneys before accepting a retainer from the defendants.

During all of the time these two attorneys were employees of the O.P.A. and at the time they severed their connection therewith, there was in force and effect a regulation in that agency designated as Regulation No. 14, which provided, among other things:

"No individual shall act or be permitted to act as * * * attorney * * * of any person in any Administrative proceeding in the Office of Price Administration, if such individual is, or within one year prior thereto has been, a full time officer or employee of the Office of Price Administration or * * * at any previous time has been officially associated with the specific matter to which the proceeding relates as a full time * * * compensated * * * officer or employee of the Office of Price Administration."

The Canons of Professional and Judicial Ethics, of the American Bar Association, which this Court regards as a standard of conduct in the matter here involved, provide:

Canon 6: "It is unprofessional to represent conflicting interests, * * * *"

"The obligation to represent the client with undivided fidelity and not to divulge

his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

Canon 36: "A lawyer, having once held public office, or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employment."

There are numerous precedents from among the Federal cases which touch upon this matter. Among these are Brown v. Miller, 52 App.D.C. 330, 286 F. 994, 997, in which the Court said:

"The law is well settled that an attorney, having acted as such for a client, cannot thereafter assume a hostile position to him about the same matter, and cannot later use against him knowledge or information obtained from his client while that relation subsisted."

In United States v. Bishop, 6 Cir., 90 F. 2d 65, 66, where there was a reversal of the lower court because it refused to grant a motion to exclude the counsel from appearing by reason of their former relations, the Court said:

"It is well settled that an attorney who has acted for one party cannot render professional services in same matter to the other party, and it makes no difference in this respect whether the relation itself has terminated, for the obligation of fidelity still continues * * * While no fraudulent intent appears, the practice gave appellee an improper advantage, and the ethical objections are insuperable. We consider this error so vital that even though no other error appeared, the judgment necessarily must be reversed."

In Gesellschaft Fur Drahtlose Telegraphie M. B. H. v. Brown, 64 App.D.C. 357, 78 F.2d 410, 412, where the Court was considering the right of the attorneys to collect fees after the litigation had been concluded, and that right was challenged on the ground that the attorneys had formerly represented the governmental agency involved in the litigation, this statement is made in reference to the rule:

"Considering first the defense based upon the rule of law that plaintiff having been employed in the office of the Alien Property Custodian between the time the property was seized and the present contract of employment entered into, plaintiff's claim for attorneys' fees is void and unenforceable, since it is in conflict with the well-established rule of public policy that where an attorney has acted for a client he cannot thereafter assume a position hostile to the client concerning the same matter, or use against the client knowledge or information obtained from him while the relation existed."

We find the rule stated again in other language in 5 Am.Jur. 298:

"It is both the right and the duty of the court to prohibit or restrain an attorney from acting for one whose interest is adverse to that of a former client."

In 7 C.J.S., Attorney and Client, § 48, p. 828, it is announced that the test of inconsistency to be applied is:

" * * * Whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection."

The attorneys contend that they had no independent knowledge when they accepted their new retainer herein, yet the stipulation in this case convincingly establishes the fact that it would be improper to permit them to continue further as the attorneys of record in this case, and I am compelled to find that they should have refrained from accepting this employment in the first instance, for not only is it violative of the regulation of the O.P.A. agency, hereinbefore quoted, governing its employees' acceptance of such employment, but it is also contrary to the standards of professional ethics and inconsistent with public policy.

It must be concluded that these attorneys, in participating in this suit, are at least inadvertently unprofessional. This does not alter the fact that it is improper for them to appear in this cause, and it is, therefore, the order of this Court that their names be stricken as counsel for the defendants.